**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**JACKSONVILLE DIVISION**

CHRISTOPHER J. EIRAS,

                           Plaintiff,             Case No. 3:16-cv-231-J-34PDB

v.

EUGENE R. BAKER, JR.,

                           Defendant.

_____/

**O R D E R**

**THIS CAUSE** is before the Court on Defendant Eugene R. Baker, Jr.'s Motion for Final Summary Judgment and Supporting Memorandum of Law (Doc. 57, Motion), filed April 2, 2018. In the Motion, Baker seeks summary judgment on Plaintiff, Christopher J. Eiras' claims against Baker for unlawful arrest and malicious prosecution. See Complaint (Doc. 2), filed March 10, 2016. In support of the Motion, Baker filed his investigative report, and supporting exhibits (Docs. 57-1, 57-2), filed April 2, 2018. On May 16, 2018, Eiras filed his Response in Opposition to Defendant, Eugene R. Baker Jr.'s Motion for Final Summary Judgment (Doc. 67, Response). Eiras opposes the Motion, and in support of his opposition, has submitted the deposition of Judge John Merritt and supporting exhibits (Doc. 68, Merritt Deposition), and the deposition of Baker and supporting exhibits (Docs. 69-75, Baker Deposition). The Motion therefore is fully briefed.

**I.    STANDARD OF REVIEW**

Under Rule 56, Federal Rules of Civil Procedure (Rule(s)), "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material

fact and the movant is entitled to judgment as a matter of law."  Rule 56(a).  The record

to be considered on a motion for summary judgment may include "depositions,

documents, electronically stored information, affidavits or declarations, stipulations

(including those made for purposes of the motion only), admissions, interrogatory

answers, or other materials."  Rule 56(c)(1)(A).[1]  An issue is genuine when the evidence

is such that a reasonable jury could return a verdict in favor of the nonmovant.  See Mize

v. Jefferson City Bd. of Educ., 93 F.3d 739, 742 (11th Cir. 1996) (quoting Hairston v.

Gainesville Sun Publ'g Co., 9 F.3d 913, 919 (11th Cir. 1993)).   "[A] mere scintilla of

evidence in support of the non-moving party's position is insufficient to defeat a motion

for summary judgment."  Kesinger ex rel. Estate of Kesinger v. Herrington, 381 F.3d 1243,

1247 (11th Cir. 2004) (citing Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252 (1986)).

The party seeking summary judgment bears the initial burden of demonstrating to

the court, by reference to the record, that there are no genuine issues of material fact to

be determined at trial.  See Clark v. Coats & Clark, Inc., 929 F.2d 604, 608 (11th Cir.

1991).  "When a moving party has discharged its burden, the non-moving party must then

go beyond the pleadings, and by its own affidavits, or by depositions, answers to

interrogatories, and admissions on file, designate specific facts showing that there is a

genuine issue for trial."  Jeffery v. Sarasota White Sox, Inc., 64 F.3d 590, 593-94 (11th

---

[1] Rule 56 was revised in 2010 "to improve the procedures for presenting and deciding summary-judgment motions." Rule 56 Advisory Committee's Note 2010 Amends.

> The standard for granting summary judgment remains unchanged. The language of subdivision (a) continues to require that there be no genuine dispute as to any material fact and that the movant be entitled to judgment as a matter of law. The amendments will not affect continuing development of the decisional law construing and applying these phrases.

Id.  "[A]lthough the interpretations in the advisory committee['s] notes are not binding, they are highly persuasive."  Campbell v. Shinseki, 546 Fed. Appx. 874, 879 n.3 (11th Cir. 2013).  Thus, case law construing the former Rule 56 standard of review remains viable and applies here.

Cir. 1995) (citations and quotation marks omitted). Substantive law determines the materiality of facts, and "[o]nly disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment." Anderson, 477 U.S. at 248; see also McCormick v. City of Ft. Lauderdale, 333 F.3d 1234, 1243 (11th Cir. 2003) ("The mere existence of some factual dispute will not defeat summary judgment unless the factual dispute is material to an issue affecting the outcome of the case."). In determining whether summary judgment is appropriate, a court "must view all evidence and make all reasonable inferences in favor of the party opposing summary judgment." Haves v. City of Miami, 52 F.3d 918, 921 (11th Cir. 1995) (citing Dibrell Bros. Int'l, S.A. v. Banca Nazionale Del Lavoro, 38 F.3d 1571, 1578 (11th Cir. 1994)).

## II.    BACKGROUND

In this action, Eiras claims that Baker arrested him without probable cause and subjected him to malicious prosecution. Baker, a Special Agent with the Florida Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco, (ABT), engaged in a nearly three month investigation of Eiras, the owner of Happy Vodka Corporation ("Happy Vodka") and Liquor Group Florida (LGF). As a result of that investigation, on August 29, 2012, with an arrest warrant, Baker arrested Eiras on numerous charges of "Moving or Concealing Alcoholic Beverages with the Intent to Defraud the State of Excise Tax . . . , Submitting False Records . . . , and Storing . . . Alcoholic Beverages Off . . . Licensed Premises."[2]  Doc. 75 at 21 (Affidavit for Arrest

---

[2] These charges constitute violations of sections 562.32, 562.45, and 562.03 of the Florida Statutes.  More particularly, Florida Statute section 562.32 provides that

> [e]very person who removes, deposits, or conceals, or is concerned in removing, depositing, or concealing any beverage for or in respect whereof any tax is imposed by the

Warrant).  After Baker arrested Eiras, and following additional investigation by the state and Eiras' defense counsel, the state attorney dropped all the charges against Eiras. Doc. 75 at 24-25 (Disposition Statement).

The events leading to the charges against Eiras began on May 24, 2012, when Baker received information from Richard Lancaster, the property manager at a warehouse on W. 16th Street in Jacksonville, FL (16th Street warehouse).  Doc. 57-1 at 3 (Investigative Report).  Lancaster reported that he suspected Eiras had been concealing multiple barrels of alcohol on the property.  Id.  Following his initial receipt of Lancaster's report, Baker interviewed and obtained affidavits from a number of individuals, inspected various properties where the barrels had been stored, and reviewed records Eiras had submitted to the ABT regarding his purchase and distribution of alcohol.  See generally Investigative Report.  Near the start of this process, on May 25, 2012, Baker seized and subsequently searched a large trailer that contained the barrels of alcohol.  Id. at 7, 9-10. Then, after further investigation, on August 29, 2012, Baker obtained an arrest warrant and arrested Eiras.  Id. at 31.

Specifically, upon receiving the initial report from Lancaster that Eiras, through his company LGF, was allegedly concealing barrels of alcohol at the 16th Street warehouse,

---

Beverage Law or would be imposed if such beverage were manufactured in or brought into this state in accordance with the regulatory provisions thereof, with intent to defraud the state of such tax or any part thereof, shall be guilty of a felony of the third degree . . . .
FLA. STAT. § 562.32.  Likewise, Florida Statute section 562.45 states, in part, that
[a]ny person willfully and knowingly making any false entries in any records required under the Beverage Law or willfully violating any of the provisions of the Beverage Law, concerning the excise tax herein provided for shall be guilty of a felony of the third degree . . . .
FLA. STAT. § 562.45(1).  Finally, Florida Statute section 562.03 commands that
[i]t is unlawful for any vendor to store or keep any alcoholic beverages except for the personal consumption of the vendor, the vendor's family and guest in any building or room other than the building or room shown in the diagram accompanying his or her license application or in another building or room approved by the division . . . .
FLA. STAT. § 562.03.

Baker searched ABT's records which indicated that LGF had a license for unit twenty-four at the warehouse. Id. at 3; Doc. 57-1 at 38-46 (Unit 24 license).[3] The following day, on May 25, 2012, Baker, along with his supervisor, David McLain, and Investigator Leonard Lee of the U.S. Department of the Treasury, Alcohol and Tobacco Tax and Trade Bureau, went to the 16th Street warehouse to meet Lancaster. Investigative Report at 3. Lancaster informed Baker and his colleagues that a few years ago, several fifty-five gallon barrels of alcohol labeled as "Happy" brand products, were delivered to the site. Doc. 57-2 at 11-12 (Lancaster June 6, 2012 Affidavit). Lancaster told Baker that he observed LGF staff regularly store the multiple drums of alcohol in warehouse units twenty-three, twenty-four, twenty-five, and thirty-three. Id. at 4; Lancaster June 6, 2012 Affidavit.[4] On many occasions, and prior to scheduled audit inspections by ABT, LGF staff would also obstruct access to several of the units in which LGF stored alcohol. Investigative Report at 4. Likewise, Lancaster reported that when ABT auditors would come to the 16th Street warehouse, LGF staff consistently escorted the auditing team only to unit twenty-three, and did not inform the auditors that the barrels, as well as additional alcohol, were located in other storage areas around the building. Id. Lancaster also told Baker and his

---

[3] Baker testified in his deposition that the only license for LGF that he had in his files indicated that the entity was only licensed to store liquor in unit twenty-four at the 16th Street warehouse. Doc. 69 at 19-20, 29 (Baker Deposition, Vol. I). However, the record reflects that LGF did hold a license that appeared to encompass the entire building, and that license was valid during the period of Baker's investigation. See id. at 19-20; Doc. 72 at 1-3. When presented with information by Eiras' counsel during a deposition indicating that the entire building was licensed during that time, Baker did not contest this fact. Baker Deposition, Vol. I at 18-20; Doc. 70 at 21-22 (Baker Deposition, Vol. II). However, the parties do not suggest, nor does the record support an inference that during Baker's investigation of Eiras, he knew of, or had access to, records indicating that LGF's license was for the entire building, rather than solely for unit twenty-four.

[4] In the course of his investigation, Baker also interviewed Anthony Hurdle, the previous owner of the 16th Street warehouse. Investigative Report at 28-29. Hurdle reported that after selling the building, he would return "to the property to occasionally . . . visit with the tenants." Id. at 29. During his visits, Hurdle observed the "55 gallon drums of alcoholic beverages in Unit #24." Id.; Doc. 57-2 at 109 (Hurdle July 12, 2012 Affidavit).

colleagues that as a result of a foreclosure action on the warehouse, Mark Farrell was the court designated receiver for the property. Id.; Doc. 57-1 at 55 (Lancaster May 25, 2012 Affidavit). Lancaster further reported that Farrell had inspected the property and informed Eiras that he needed to remove the barrels because they presented a fire hazard. Investigative Report at 4; Lancaster May 25, 2012 Affidavit.[5]

To this end, Eiras obtained a trailer into which he placed the barrels, and he asked Lancaster to secure the trailer. Investigative Report at 4; Lancaster May 25, 2012 Affidavit. In the process of locking up the trailer, Lancaster noticed that the barrels were stored in the back of the trailer, obscured behind lots of cardboard and boxes. Investigative Report at 4; Lancaster May 25, 2012 Affidavit. Eiras initially left the trailer on the 16th Street warehouse property, but after Farrell protested, Eiras had the trailer transported to the Laney & Duke warehouse, also in Jacksonville, FL (Laney & Duke warehouse). Sandra Powell, manager of the Laney & Duke warehouse, reported to Baker that when an agent on behalf of Eiras, a Jason Bandy, called to inquire about storing the trailer at her warehouse, she asked about its contents. Bandy told her that the trailer contained cardboard, and because he was repaving his parking lot, he needed an alternative place to store the materials. Investigative Report at 6; Doc. 57-1 at 71 (Powell

---

[5] Baker subsequently interviewed Farrell on June 4, 2012. Farrell noted that when he initially toured the 16th Street warehouse, he noticed liquor stored in units twenty-three, twenty-four, twenty-six, thirty-two, and thirty-three, and that the barrels in question were stored in unit twenty-four. Investigative Report at 15; Doc. 57-1 at 101-102 and Doc. 57-2 at 1-2 (Farrell June 4, 2012 Affidavit). Concerned that the barrels presented a fire hazard, Farrell told Eiras that he needed to remove them from the building. Investigative Report at 16; Farrell June 4, 2012 Affidavit at 102. Farrell also informed Eiras that it might be advisable for ABT to come to the 16th Street warehouse and conduct an inventory. Investigative Report at 16. Eiras demurred, stating that he "did not want an agent from ABT to respond, that ABT conducts an inventory of his . . . premises every six months and ABT is a pain in the 'a--.'" Id. Nonetheless, Eiras did agree to relocate the barrels from the building. Id.

6

May 25, 2012 Affidavit).  Bandy did not mention that the trailer also contained barrels of alcohol.

Despite further investigation, Baker was unable to locate Bandy, or the organization he had said he was working for, a business called NPSI.  See Investigative Report at 6; Doc. 57-1 at 60-70 (Laney & Duke lease).  Indeed, when Baker called the contact phone numbers associated with Bandy and NPSI as listed on the lease application for the Laney & Duke warehouse, he found that the numbers had been disconnected or were only connected to a fax line.  Investigative Report at 6.  Baker therefore surmised that whoever had rented the trailer space did so under a fictitious name and an equally fictitious business entity.[6]

While at the Laney & Duke warehouse on May 25, 2012, Baker and his associates observed the trailer.  See Investigative Report at 6.  Baker had the trailer X-rayed and weighed which confirmed that multiple barrels were stored at the front of the trailer, while at the rear of the trailer, near its loading doors, there were several pallets of cardboard and boxes.  Id.  At that point, believing he had probable cause to conclude that the trailer contained the barrels that had been otherwise concealed from ABT, Baker seized the trailer pending the issuance of a search warrant.  Id. at 6-7.  He then had the trailer transported to the Jacksonville Sheriff's Office Vehicle Impoundment Facility.  Id.

Next, Baker obtained a warrant from Judge John Merritt to search the trailer.  Id. at 9.[7]  Upon opening the trailer, Baker observed "numerous pallets of Happy Brand shipping boxes and two pallets of boxes containing new empty Happy Brand liquor

---

[6]When Baker was deposed by Eiras' counsel in December 2017, counsel informed Baker that his supposition was incorrect, and that the individual who rented the space for the trailer was not fictitious, but rather worked as an accountant in the Cayman Islands.  Baker Deposition, Vol. II at 16-17.
[7] Eiras has not challenged either the seizure or search of the trailer.

bottles." Id. Behind those boxes, he saw "blue 55 gallon barrels which matched the description of the barrels removed from" the 16th Street warehouse. Id. When he entered the trailer, he had to climb over the pallets of shipping boxes to reach the barrels which were located about twenty-seven and a half feet from the entrance of the trailer. Id. at 10. All told, Baker and his team seized fifty-seven barrels of assorted liquor, eighteen pallets of shelving boxes, one pallet of empty Happy Vodka bottles, and one pallet of empty Happy Tequila bottles. See Doc. 57-2 at 129 (Search Warrant). The liquid in the barrels was subsequently tested and confirmed to be alcohol ranging from thirty-nine percent proof to ninety-four percent proof. Investigative Report at 17.

The following week, on June 1, 2012, Baker and his colleagues arrived at the 16th Street warehouse to conduct a licensed premises inspection. Id. at 11.[8] When they arrived, "Jacksonville District Office [ABT] auditors were already at the [warehouse] to conduct a scheduled inventory." Id. Those auditors included Jerry Jones, Debi Reid, Talisa Hoke, and Terry Lansing. Id. An LGF employee, Julio Alvarez, unlocked unit twenty-three for the ABT auditors to inspect its contents. Id. Alvarez did not indicate that any other spaces in the building contained product to be inventoried. Likewise, access to other portions of the building, and in particular, units twenty-four and thirty-three, were blocked by debris and therefore inaccessible to the ABT auditing team. Id.

Upon completing the inventory for unit twenty-three, the ABT audit team leader, Jones, asked Alvarez to call Eiras so that Jones could confirm with Eiras that the ABT

---

[8] Florida Statute section 562.41(5) directs that

[l]icensees, by the acceptance of their license, agree that their places of business shall always be subject to be inspected and searched without search warrants by the authorized employees of the division and also by sheriffs, deputy sheriffs, and police officers during business hours or at any other time such premises are occupied by the licensee or other persons.

FLA. STAT. § 562.41(5).

audit team's inventory count matched Eiras' records. When speaking to Eiras, Jones also asked whether there was any other product to be inventoried, other than that in unit twenty-three. Id. at 11-12. Eiras said there was not, and authorized Alvarez to sign Jones' auditing report on his behalf, confirming the inventory numbers calculated by Jones and his team. Baker then spoke with Eiras and informed him that Baker and his team were conducting a licensed premises inspection. He asked Eiras "if there was any other product on the premises and if the completed inventory [by Jones] was accurate." Id. In response, Eiras "advised there was no other product on the premises and that the inventory was accurate." Id. at 12.

Baker then questioned Alvarez. Alvarez confirmed that LGF used units twenty-three, twenty-four, and thirty-three to store alcohol, and that for some period of time the multiple fifty-five gallon barrels were stored in unit twenty-four. Id.; Doc. 57-1 at 83-84 (Alvarez June 1, 2012 Affidavit). However, Alvarez did not know when the barrels were removed from that unit. Alvarez also reported that Eiras directed him to block access to units twenty-four and thirty-three in advance of the June 1, 2012, ABT audit. Investigative Report at 12; Alvarez June 1, 2012 Affidavit. Other LGF employees similarly reported that in preparation for regularly scheduled audits, Eiras often directed them to provide the auditing teams access to only unit twenty-three, and not to other areas in the building. Investigative Report at 13.

Notably, all of the auditors reported that over the past several years when they conducted inventories at the 16th Street warehouse, LGF staff only provided them with access to unit twenty-three. Id. at 19-23. Similarly, they stated that Eiras and his staff did not inform the auditing team that product was stored in other units. Likewise, the

auditors observed that units twenty-four and thirty-three were often inaccessible and blocked by debris.  Id.; see also Doc. 57-2 at 41-42 (Lansing June 11, 2012 Affidavit); Doc. 57-2 at 43 (Hoke June 11, 2012 Affidavit); Doc. 57-2 at 44 (Reid June 11, 2012 Affidavit); Doc. 57-2 at 45-47 (Jones June 5, 2012 Affidavit).

While on the premises, Baker asked Alvarez to remove the barriers that blocked units twenty-four and thirty-three.  Investigative Report at 12.  Alvarez did so, but only after gaining access to a fork lift, which he had to use to remove the materials that were otherwise obstructing access to the units.  Id. at 12, 14.  Once Baker and his team gained access to the additional units, they discovered large quantities of wine and other pallets of alcohol that otherwise had been inaccessible to the auditing team.  Id.  Jones noted that ABT had no record "as to when and how much wine was received or sold from" unit twenty-four.  Id. at 14.

As a result of the June 1, 2012, licensed premises inspection, Baker cited Eiras for failure to display beverage license, various storage violations, and failure to maintain invoices on the licensed premises.[9]

On June 4, 2012, in response to the seizure of the trailer and subsequent search at the 16th Street warehouse, Eiras sent a letter to ABT, explaining in part, that in 2003,

_____

[9] As relevant to these initial citations against Eiras, Florida Statute section 561.23 directs that "[a]ll vendors licensed under the Beverage Law shall display their licenses in conspicuous places on their licensed premises."  FLA. STAT. § 561.23.  Likewise, and as noted earlier in the order, pursuant to Florida Statute section 562.03,

> [i]t is unlawful for any vendor to store or keep any alcoholic beverages except for the personal consumption of the vendor, the vendor's family and guest in any building or room other than the building or room shown in the diagram accompanying his or her license application or in another building or room approved by the division.

FLA. STAT. § 562.03.  Finally, ABT can revoke or suspend the license of any person who "fails to maintain records of all monthly sales and all monthly purchases of alcoholic beverages and to produce such records for inspection by any division employee within 10 days of written request therefor."  FLA. STAT. § 561.29(j).

Eiras has not raised any legal challenge to Baker's June 1, 2012, search of the 16th Street warehouse.

Eiras' company, Happy Vodka, was involved in a federal lawsuit in which it was sued by an alcohol import/export firm, NWB Imports & Exports. See Doc. 2-4 (June 4, 2012 letter). During the lawsuit, Happy Vodka "product was subpoenaed . . . to be provided in drum format for the inspection of the Federal Appeals Court in Atlanta as court exhibits." Id. at 2. At the time, and as Eiras reported in his letter, he allegedly "consulted with [his] local ABT office . . . and [was] instructed not to open the drums for any reason and that the other exhibits such as the finished Happy Vodka bottles . . . could remain in storage and not inventoried as gallonage so long as they were not to be sold." Id. When the litigation ended, "all of the exhibits including [the] Drums . . . were returned to the control of Liquor Group." Id.

The record further reflects that in 2007, the distillery that was "holding approximately 60 drums of [alcohol] as evidence samples on [LGF's] behalf in FL [went] bankrupt and . . . requested that [LGF] remove the samples from their control." Doc. 2-1 (November 26, 2007 letter). As such, on November 26, 2007, Eiras wrote to ABT informing the agency that LGF was taking possession of the barrels, and sought advice as to what the company was "to do with these drums and if there are any requirements for [it] to take possession of the product." November 26, 2007 letter. Eiras noted that the "product in its current state is not fit for human consumption, and [LGF intended] to use it toward the next production of" Happy Vodka. Id.[10] While the record does not identify all of the various places Eiras subsequently stored the barrels, the barrels were eventually delivered to the 16th Street warehouse a few years prior to 2012. Lancaster June 6, 2012 Affidavit.

---

[10] There is no indication in the record that ABT responded to Eiras' letter, or that ABT's records regarding LGF contained any reference to it.

In April of 2012, the 16th Street warehouse faced foreclosure. Farrell, who was appointed as the receiver in that action, demanded that Eiras remove the barrels. As noted in his June 4, 2012 letter to ABT, Eiras stated that pursuant to a state court proceeding associated with the foreclosure, Eiras was commanded by the state court to "obey the instructions of Mr. Farrell." June 4, 2012 letter at 2. As such, Eiras contended that "there was no malicious intent on the part of" LGF in moving the barrels. Id. at 3. Rather, he was "only trying to comply with confusing court orders." Id. According to Eiras, he stored the drums in the trailer and eventually moved the trailer from the 16th Street warehouse to the Laney & Duke warehouse. It was here, however, that Bandy, who rented the Laney & Duke warehouse space on behalf of Eiras, told the Laney & Duke warehouse manager that the trailer contained cardboard, and made no mention that it also contained multiple barrels of alcohol. Investigative Report at 6; Powell May 25, 2012 Affidavit.[11] Likewise, Bandy told the warehouse manager that the reason he needed to store the trailer at the site was because he was repaving his parking lot. However, this proffered reason was not otherwise substantiated by Baker's investigation.

At the time Baker seized and searched the trailer on May 25, 2012, and conducted the licensed premises search at the 16th Street warehouse on June 1, 2012, he lacked

---

[11] In response to the other citations Baker issued against Eiras after the June 1, 2012 licensed premises inspection, Eiras proffered that "it is our understanding that during the timeline of the inventory audit, a copy of the current license was provided to the auditors that was sufficient to the posting requirements." June 4, 2012 letter at 4. Likewise, Eiras indicated that

> [o]utside of 6 months of records that were already in the control of the [ABT] of the State of Florida for a recent audit that was cleared without issue, all of the other records are stored on several pallets in the warehouse unless they are still in processing.
>
> These records are in boxes and are stored chronologically and take up several pallets of floor space and we are unaware as to why [Baker] was unable to find them in the warehouse.

Id. However, Eiras did not provide any explanation for why he failed to disclose to either Jones or Baker that there were several places within the building which contained alcohol potentially subject to audit by ABT.

any knowledge regarding the 2003 federal lawsuit, or the subsequent state court order directing Eiras to comply with any directions issued by Farrell.  Indeed, he only learned of these events after the June 1, 2012, licensed premises inspection, which revealed that Eiras had taken steps to conceal and limit ABT's access to LGF's inventory.[12]

Baker's Investigative Report reflects that he eventually received and reviewed Eiras' June 4, 2012 letter.  Investigative Report at 17.  Likewise, the Investigative Report suggests, and Baker confirmed in his deposition, that he read and was aware of Eiras' November 26, 2007 letter to the ABT.  Id.; Doc. 69 at 24-25, 30, 32-33, 38-34 (Baker Deposition, Vol. I); Doc. 70 at 8, 19 (Baker Deposition, Vol. II).  As detailed in the Investigative Report, Baker's supervisors directed him to provide them with a response to the information contained in Eiras' two letters.  Investigative Report at 17-18.  Accordingly, Baker noted that

> there is no documentation within the Division in regards to the Federal litigation between Happy Vodka Corporation and NWB Imports & Exports. . . .
> Agent Baker consulted with Auditing Supervisor Margaret Perez in reference to . . . [Eiras] consulting with ABT in reference to the storage of any Happy Brand products to include the 55 gallon [barrels] . . .  Perez advised she had no knowledge of [Eiras] consulting ABT.  However, Perez did advise at one point . . . [Eiras] did have alcoholic beverages stored at a Federal bonded warehouse in Jacksonville . . . .  Perez stated once the alcoholic beverages are removed from the Federally bonded warehouse and released to the distributor all the alcoholic beverages need to be disclosed to the Division; failure to do so is a violation of Florida statute.

Id. at 18.

---

[12] Eiras' letter to ABT was dated June 4, 2012, the same date on which Baker interviewed Farrell.  Baker's Investigative Report further reflects that on June 13, 2012, he met with the attorney representing the lender in the warehouse foreclosure action.  That attorney verified the state court action commanding that Eiras comply with any directions he received from Farrell.  Investigative Report at 25.  The attorney also reported that he accompanied Farrell to the 16th Street warehouse where the men "observed numerous blue plastic 55 gallon barrels in unit #23, Unit #24, and Unit #25."  Id.  He also noted that the men observed that the barrels had a "flammable" sticker attached to them.  Id.

In continuing his investigation of Eiras and LGF, on June 7, 2012, Baker again met with Jones, the ABT auditor. Based on Jones' inspection of Eiras' monthly liquor reports to ABT, Jones concluded that for at least the last five scheduled inventory cycles, Eiras failed to disclose liquor purchases, resulting in potentially unpaid excise taxes of over $200,000. Id. at 19-20. Baker's ongoing investigations uncovered other potential reporting irregularities and inaccuracies. Id. at 24, 26, 29-30.[13]

On Monday, August 27, 2012, Baker prepared an affidavit in support of a request for an arrest warrant for Eiras. In his affidavit, Baker stated that he had been informed by Lancaster that Eiras

> was in possession of 55 gallon barrels of alcoholic beverages that were never disclosed to the Division of Alcoholic Beverages and Tobacco . . . . Additional information . . . . revealed [Eiras] removed the barrels of alcoholic beverages from the warehouse, concealed the barrels of alcoholic beverages in a semi trailer and moved the trailer to an undisclosed location.

Affidavit for Arrest Warrant at 21. He went on to state that his investigation led him to find the trailer at the Laney & Duke warehouse, where after obtaining a search warrant for the trailer, he observed that "there were (57) 55 gallon barrels of alcoholic beverages [] concealed behind pallets of cardboard inside the trailer." Id. at 21. Additionally, Baker relayed the events of the June 1, 2012, scheduled inventory conducted by Jones and the ABT auditing team at the 16th Street warehouse, where the auditors were granted access only to unit twenty-three, but were not informed by Eiras or his staff of alcohol stored in other units in the warehouse. Id. at 22. Baker further reported in the affidavit that during previous audits, the auditors were consistently provided access only to unit twenty-three,

---

[13] Despite Baker and Jones' initial review of Eiras' monthly liquor reports, ABT later determined that Eiras did not owe any outstanding excise taxes to the state. Baker Deposition, Vol. II at 20. However, ABT did not make this determination until October 12, 2012, nearly a month and a half after Baker arrested Eiras. Id.; Disposition Statement at 2.

and that units twenty-four and thirty-three were often barricaded and inaccessible.  Id.

Likewise, Baker detailed how Eiras confirmed with Jones, the audit leader, that Jones'

numbers were correct and that only unit twenty-three contained product; and the fact that

Baker and his team then gained access to other units at the property, and discovered

other alcohol.  Id.  Finally, Baker reported that Eiras' monthly liquor reports between

October 2010 and April 2012 contained falsities, thereby allowing Eiras to escape excise

tax requirements.  Id. at 22-23.  However, Baker did not include in his affidavit the

information from Eiras' November 26, 2007, or June 4, 2012 letters to ABT in which Eiras

explained, in part, that his possession of the barrels was associated with the 2003 federal

lawsuit, and that his relocation of the barrels was connected to the foreclosure action on

the 16th Street warehouse.

Prior to presenting the affidavit and request for a warrant to Judge John Merritt,

Baker met with an assistant state attorney who reviewed and approved the proposed

request and warrant.  Investigative Report at 31.  Additionally, and as he stated in his

deposition, Baker sought legal direction from Robert Ehrhardt, counsel to ABT, and his

direct supervisor.  Baker Deposition, Vol. I at 20-21, 26; Baker Deposition, Vol. II at 24.

In particular, Baker informed Ehrhardt about the information contained in both the

November 26, 2007, and June 4, 2012 letters.  Eiras also sought direction from ABT

attorneys as to whether Eiras, who held a distributor's license, might nonetheless be liable

under Florida Statute section 562.03, which by its terms, indicates it applies only to

vendors.  See Baker Deposition, Vol. I at 17, 20-21.  At his deposition, Baker testified that

ABT legal staff, as well as his direct supervisor McLain, advised him the statute could

apply to Eiras.  Id. at 17, 21.  Likewise, Ehrhardt stated in an affidavit that in May of 2012

I was made aware of ABT's investigation of Mr. Eiras and Liquor Group of Florida, LLC, and began providing counsel to Special Agent Eugene Baker on the matter. During the course of the investigation, I was informed of the June 4, 2012 correspondence that Christopher J. Eiras provided to ABT and received a briefing from Lieutenant David McClain [sic] and Special Agent Baker regarding the matter. Upon being advised of the fact[s] and evidence, I advised Special Agent Baker that in light of the June 4, 2012 correspondence, the investigation should continue. Upon conclusion of the investigation, I determined that ABT possessed sufficient evidence to support a finding of probable cause to arrest Christopher J. Eiras. My conclusion was based upon the totality of the evidence, my knowledge of governing statues and rules, and my experience as a criminal prosecutor and defense attorney.

Doc. 57-2 at 136-37 (Ehrhardt Affidavit). Baker's direct supervisor, McLain, also reviewed the affidavit and warrant request. McLain affirmed that he

personally reviewed the "Affidavit for Arrest Warrant" [prepared by Baker,] . . . and believe the statements therein were true and accurate at the time they were presented to Judge John Merr[i]tt. I also reviewed the factual evidence and supporting documentation obtained through Baker's investigation to verify that probable cause existed for each criminal charge sought against Christopher Eiras. After reviewing the aforementioned documents and evidence, I authorized Agent Baker to present the "Affidavit for Arrest Warrant" to the State Attorney's Office and a judge because there was a factual basis to find probable cause for an arrest of Christopher J. Eiras on each criminal charge contained therein.

Doc. 57-2 at 138-39 (McLain March 4, 2018 Affidavit).

Upon reviewing Baker's affidavit and accompanying proposed arrest warrant, Judge Merritt signed the warrant. Two days later, on August 29, 2012, Baker arrested Eiras and charged him "with sixty-one (61) counts of Moving or Concealing Alcoholic Beverages with the Intent to Defraud the State of Excise Tax, eight (8) counts of Submitting False Records to Avoid Excise Tax, and one (1) count of Storage of Alcoholic Beverages off the Licensed Premises." Complaint at ¶ 25 (Complaint, filed March 10, 2016). However, on April 28, 2014, after further review of the charges against Eiras, the

state attorney declined to proceed with the prosecution against him.  See Doc. 2-5 (Disposition of Charges).

Eiras then filed the instant action against both Baker and ABT.  See Complaint. The Court has dismissed several of Eiras' claims against Baker and ABT.  See Doc. 19 (Order of Dismissal, filed March 7, 2017), Doc. 34 (Second Order of Dismissal, filed Oct. 16, 2017).  What remain before the Court are Eiras' claims in Counts I and IV against Baker.  In Count I, Eiras asserts a federal civil rights claim against Baker pursuant to 28 U.S.C. § 1983, for violating Eiras' Fourth Amendment rights to "be free from unlawful searches and seizures."  Complaint at ¶ 29.  In Count IV, Eiras alleges a state law claim against Baker for malicious prosecution.  Id. at ¶¶ 41-44.  The parties have engaged in discovery, and Baker now moves the Court to grant summary judgment in his favor.

### III.    ARGUMENTS OF THE PARTIES

In the Motion, Baker argues that pursuant to the doctrine of qualified immunity, judgment as a matter of law should be entered in his favor as to both Counts I and IV.  He asserts that at all times, he was acting within his discretionary authority as an agent for ABT.  Motion at 5.   Additionally, he contends that there was nothing unlawful about his actions, id. at 5-7, in that he had both actual and arguable probable cause to arrest Eiras, and that both his direct supervisor and ABT legal counsel supported his conclusion.  Id. at 7-11.  In response, Eiras first suggests that "there are sufficient material facts in dispute," Response at 1, and then argues that the doctrine of qualified immunity is not applicable to this case.  Response at 3.  Eiras posits that Baker did not have either actual or arguable probable cause to arrest him.  Id. at 4, 7-9.  In particular, Eiras argues that Baker possessed exculpatory information at the time he arrested Eiras, in the form of the

November 26, 2007, and June 4, 2012 letters.  Eiras further argues that Baker failed to include that exculpatory information in the supporting affidavit he presented to the judge for Eiras' arrest, thereby undermining any argument that a reasonable officer would have concluded that probable cause existed for the arrest.  Id. at 3-7.[14]

## IV.     DISCUSSION[15]

Before addressing the merits of Baker's qualified immunity defense, the Court notes that Baker appears to misapprehend the application of qualified immunity.  Although Baker argues that he is entitled to qualified immunity with respect to both Counts I and IV, he is mistaken.  In Count IV, Eiras asserts a state law claim for malicious prosecution. Qualified immunity does not apply to claims governed by state law.  D'Aguanno v. Gallagher, 50 F.3d 877, 879 (11th Cir. 1995) (recognizing that "qualified immunity is a defense only to federal claims" and cannot be applied to state law claims).  Thus, the Court will address Baker's qualified immunity argument only as it applies to his federal claim under § 1983.

"[S]ection 1983 provides individuals with a federal remedy for the deprivation of rights, privileges, or immunities protected by the Constitution or the laws of the United States that are committed under color of state law."  Brown v. City of Huntsville, Ala., 608

_____

[14] Notably, Eiras does not specifically challenge any of the facts detailed in Baker's Motion.  Motion at 2-3. Instead, he argues that based on the facts presented to the Court by the parties, Baker lacked actual or probable cause to arrest Eiras, and therefore violated his constitutional rights.  Response at 3, 4, 5, 7, 8. "Where the material facts are undisputed, the question of whether arguable probable cause exists is a question of law and is thus proper for resolution on summary judgment."  Hambrick v. City of Savannah, Ga., No. 4:14-CV-12, 2014 WL 4829457, at *5 (S.D. Ga. Sept. 29, 2014).  In citing to Hambrick, the Court notes that "[a]lthough an unpublished opinion is not binding . . . , it is persuasive authority." United States v. Futrell, 209 F.3d 1286, 1289 (11th Cir. 2000) (per curiam); see generally Fed. R. App. P. 32.1; 11th Cir. R. 36–2 ("Unpublished opinions are not considered binding precedent, but they may be cited as persuasive authority.").

[15] On April 4, 2018, Baker filed a request for Oral Argument on his Motion.  See Doc. 58 (Request for Oral Argument).  The Court denies his request, as oral argument will not assist the Court in resolving the Motion.

F.3d 724, 733 n.12 (11th Cir. 2010) (citation omitted); <u>see</u> 42 U.S.C. § 1983. Thus, to state a claim for relief under § 1983, a plaintiff must sufficiently allege that he or she was "'deprived of a right secured by the Constitution or laws of the United States, and that the alleged deprivation was committed under color of state law.'" <u>See</u> <u>Focus on the Family v. Pinellas Suncoast Transit Auth.</u>, 344 F.3d 1263, 1276-77 (11th Cir. 2003) (quotation omitted). Here, in Count I, Eiras seeks relief under § 1983 for Baker's violation of his "right to be free from unlawful searches and seizures under the Fourth Amendment of the United States Constitution." Complaint at ¶ 29 (Count I).

The doctrine of "[q]ualified immunity protects from civil liability government officials who perform discretionary functions if the conduct of the officials does not violate 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" <u>Nolin v. Isbell</u>, 207 F.3d 1253, 1255 (11th Cir. 2000) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)). As a result, this defense protects from suit "'all but the plainly incompetent or those who knowingly violate the law.'"[16] <u>Carr v. Tatangelo</u>, 338 F.3d 1259, 1266 (11th Cir. 2003) (quoting <u>Malley v. Briggs</u>, 475 U.S. 335, 341 (1986)). Indeed, as "'government officials are not required to err on the side of caution,' qualified immunity is appropriate in close cases where a reasonable officer could have believed that his actions were lawful." <u>Lee v. Ferraro</u>, 284 F.3d 1188, 1200 (11th Cir. 2002) (quoting <u>Marsh v. Butler Cnty.</u>, 268 F.3d 1014, 1031 n.8 (11th Cir. 2001)).

---

[16] In determining whether a defendant is entitled to qualified immunity, the court views the facts and all reasonable inferences in the light most favorable to the plaintiff to the extent supported by the record, and then considers "the legal issue of whether the plaintiff's 'facts,' if proven, show that the defendant violated clearly established law." <u>Priester v. City of Riviera Beach</u>, 208 F.3d 919, 925 n.3 (11th Cir. 2000); <u>Scott v. Harris</u>, 550 U.S. 372, 381 n.8 (2007).

In order to be entitled to qualified immunity, the defendant must first establish that his conduct was within the scope of his discretionary authority.  See Webster v. Beary, 228 Fed. Appx. 844, 848 (11th Cir. 2007) (per curiam); Lee, 284 F.3d at 1194.  Neither party contends that Baker was acting outside the scope of his discretionary authority when he obtained the arrrest warrant and subsequently arrested Eiras.[17]  Therefore, the burden shifts to Eiras "to show that qualified immunity is not appropriate." Lee, 284 F.3d at 1194.  To do so, Eiras must establish two elements: (a) that Baker violated a constitutional right, and (b) the right violated was clearly established.  Kingsland v. City of Miami, 382 F.3d 1220, 1232 (11th Cir. 2004) (citing  Saucier v. Katz, 533 U.S. 194, 201 (2001)).  The Court may consider these elements in whichever order it chooses, and qualified immunity will protect the defendant if the plaintiff fails to establish either element. Pearson v. Callahan, 555 U.S. 223, 232, 236 (2009).

"An arrest without a warrant and lacking probable cause violates the Constitution and can underpin a § 1983 claim . . . ." Brown, 608 F.3d at 734.  However, when an individual is arrested pursuant to a warrant, even where that individual asserts the warrant was invalid, the Eleventh Circuit has directed that the proper claim for relief is that of malicious prosecution, rather than a claim of false arrest.  See Carter v. Gore, 557 Fed. Appx. 904, 906 (11th Cir. 2014) ("The issuance of a warrant – even an invalid one . . . – constitutes legal process, and thus, where an individual has been arrested pursuant to a warrant, his claim is for malicious prosecution rather than false arrest."); Harris v. Johnson's Giant Foods, Inc., No. 2:16-cv-1646-RDP, 2017 WL 6336330, at *5 (N.D. Ala.

---

[17] "'A government official acts within his discretionary authority if the actions were (1) undertaken pursuant to the performance of his duties and (2) within the scope of his authority.'" Jones v. City of Atlanta, 192 Fed. Appx. 894, 897 (11th Cir. 2006) (per curiam) (quoting Lenz v. Winburn, 51 F.3d 1540, 1545 (11th Cir. 1995)).

Dec. 12, 2017) (arrest pursuant to a warrant, albeit allegedly invalid, gives rise to a malicious prosecution claim).

A viable § 1983 malicious prosecution claim requires a plaintiff to prove "a violation of his Fourth Amendment right to be free from unreasonable seizures, as well as the elements of the common law tort of malicious prosecution." Zargari v. United States, 658 Fed. Appx. 501, 506 (11th Cir. 2016). The essential elements of a Florida common law malicious prosecution claim include:

> (1) an original criminal or civil judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding against the present plaintiff as the defendant in the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damage as a result of the original proceeding.

Id. at 3, n 2 (quoting Alamo Rent-A-Car v. Mancusi, 632 So.2d 1352, 1355 (Fla. 1994)). The Eleventh Circuit has recognized that a law enforcement officer who makes an arrest pursuant to a warrant can nevertheless be liable for malicious prosecution in at least two circumstances. First, a malicious prosecution claim can arise when an officer secures a warrant under circumstances in which a reasonably well trained officer "would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant." Kelly v. Curtis, 21 F.3d 1544, 1554 (11th Cir. 1994) (quoting Malley, 475 U.S. at 345); see also Carter, 557 Fed. Appx. at 908. Second, the court has recognized a malicious prosecution claim if the officer presented materially false statements or omissions in an affidavit in support of the arrest warrant. Kelly, 21 F.3d at 1554; see also Carter, 557 Fed. Appx. at 907-08.

In considering whether an officer had probable cause to seek an arrest warrant, the Eleventh Circuit instructs:

> [f]or probable cause to exist, . . . an arrest must be objectively reasonable based on the totality of the circumstances. This standard is met when the facts and circumstances within the officer's knowledge, of which he or she has reasonably trustworthy information, would cause a prudent person to believe, under the circumstances shown, that the suspect has committed, is committing, or is about to commit an offense.

Lee, 284 F.3d at 1195 (quotation and internal quotation marks and citation omitted). However, "[t]o receive qualified immunity, an officer need not have actual probable cause, but only 'arguable' probable cause." Brown, 608 F.3d at 734. Accordingly, the dispositive question for qualified immunity purposes "is not whether actual probable cause existed; rather, the question is whether the officer had 'arguable' probable cause." Carter, 557 Fed. Appx. at 908; see also Swanson v. Scott, No. 2:17-CV-67-FtM-99MRM, 2018 WL 3817760, at *6 (M.D. Fla. Aug. 10, 2018) (citing Grider v. City of Auburn, Ala., 618 F.3d 1240, 1257 (11th Cir. 2010)). "Arguable probable cause exists 'where reasonable officers in the same circumstances and possessing the same knowledge as the Defendant[] could have believed that probable cause existed to arrest.'" Lee, 284 F.3d at 1195 (quotation omitted); see also Brown, 608 F.3d at 734. "This standard recognizes that law enforcement officers may make reasonable but mistaken judgments regarding probable cause but does not shield officers who unreasonably conclude that probable cause exists." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007).

"'The essence of qualified immunity analysis [as to arguable probable cause] is the public official's objective reasonableness, regardless of his underlying intent or motivation.' 'The standard is an objective one, and therefore does not include an inquiry in the officers' subjective intent or beliefs[,]" which are irrelevant. Rushing v. Parker, 599

F.3d 1263, 1266 (11th Cir. 2010) (per curiam) (internal quotations omitted).  Moreover, "[p]olice officers are not expected to be lawyers or prosecutors[,]" and "[a]rguable probable cause does not require an arresting officer to prove every element of a crime or to obtain a confession before making an arrest[.]"  Scarbrough v. Myles, 245 F.3d 1299, 1302-03 & n.8 (11th Cir. 2001) (per curiam) (citation omitted).  The proper focus is on "whether [the arresting officer] violated clearly established law in making the arrest[] based on the objective factors that gave rise to his probable-cause determination and not whether the arrestees' actions actually constituted a crime."  Id. at 1303 n.8.  Thus, "what counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."  Jones v. Cannon, 174 F.3d 1271, 1283 n.4 (11th Cir. 1999) (collecting cases).

In making an arrest affidavit or seeking an arrest warrant, "[a]n arresting officer is required to conduct a reasonable investigation to establish probable cause."  Rankin v. Evans, 133 F.3d 1425, 1435 (11th Cir. 1998).  An officer may not "choose to ignore information that has been offered to him or her . . . [or] conduct an investigation in a biased fashion or elect not to obtain easily discoverable facts . . . ."  Kingsland, 382 F.3d at 1229.  Indeed, "[a] police officer may not close her or his eyes to facts that would help clarify the circumstances of an arrest.  Reasonable avenues of investigation must be pursued especially when, . . . it is unclear whether a crime [has] even taken place."  See BeVier v. Hucal, 806 F.2d 123, 128 (7th Cir. 1986) (alterations added); see also Ahlers v. Schebil, 188 F.3d 365, 372 (6th Cir. 1999) ("[O]fficers, in the process of determining whether probable cause exists, cannot simply turn a blind eye toward potentially exculpatory

evidence known to them in an effort to pin a crime on someone."). Although officers "need not conduct a 'mini-trial' before making an arrest, . . . probable cause does not exist when a 'minimal further investigation' would have exonerated the suspect." Kuehl v. Burtis, 173 F.3d 646, 650 (8th Cir. 1999) (internal citations omitted). However, "[a]n officer does not have to take 'every conceivable step . . . at whatever cost, to eliminate the possibility of convicting an innocent person.'" See Williams v. City of Homestead, Fla., 206 Fed. Appx. 886, 888 (11th Cir. 2006) (quoting Tillman v. Coley, 886 F.2d 317, 321 (11th Cir. 1989)).

Moreover, "while a police officer should consider a suspect's explanation in evaluating the existence of probable cause, [the officer] 'is under no obligation to give any credence to a suspect's story nor should a plausible explanation in any sense require the officer to forego arrest pending further investigation if the facts as initially discovered provide probable cause.'" Williams, 206 Fed. Appx. at 888-89 (quoting Criss v. City of Kent, 867 F.2d 259, 263 (6th Cir. 1988)). Significantly, "in determining whether probable cause to arrest exists, an officer must consider all facts and circumstances within that officer's knowledge, including facts and circumstances conclusively establishing an affirmative defense." See Williams v. Sirmons, 307 Fed. Appx. 354, 359 (11th Cir. 2009). Indeed, officers are not permitted "to turn a blind eye to exculpatory information that is available to them, and instead support their actions on selected facts they chose to focus upon." See Kingsland, 382 F.3d at 1228 (citing Sevigny v. Dicksey, 846 F.2d 953 (4th Cir. 1988)). Finally, "whether an officer possesses probable cause or arguable probable cause depends on the elements of the alleged crime and the operative fact pattern." Brown, 608 F.3d at 735 (citations omitted).

Where a federal claim of malicious prosecution is based on alleged false statements or omissions by the officer in an affidavit supporting an arrest warrant, the Eleventh Circuit has explained:

> [a] warrant affidavit violates the Fourth Amendment when it contains omissions made intentionally or with a reckless disregard for the accuracy of the affidavit. A party need not show by direct evidence that the affiant makes an omission recklessly. Rather, it is possible that when the facts omitted from the affidavit are clearly critical to a finding of probable cause the fact of recklessness may be inferred from proof of the omission itself. Omissions that are not reckless, but are instead negligent, or insignificant and immaterial, will not invalidate a warrant. Indeed, even intentional or reckless omissions will invalidate a warrant only if inclusion of the omitted facts would have prevented a finding of probable cause.

Madiwale v. Savaiko, 117 F.3d 1321, 1326–27 (11th Cir. 1997) (internal citations and quotations omitted); see also Smith v. Sheriff, Clay County, Fla., 506 Fed. Appx. 894, 898 (11th Cir. 2013); Daniels v. Bango, 487 Fed. Appx. 532, 537 (11th Cir. 2012).

In arguing that he is entitled to qualified immunity for Eiras' federal malicious prosecution claim, Baker asserts that under any probable cause standard, he reasonably determined that there was probable cause to arrest Eiras. He further argues that even in the presence of Eiras' November 26, 2007, and June 4, 2012 letters to ABT, "reasonable officers in the same circumstances and possessing the same knowledge as the Defendant could have believed probable cause existed to arrest." Motion at 10. In response, Eiras asserts that Baker failed to satisfy any probable cause threshold, and that he intentionally failed to include within the supporting affidavit for Eiras' arrest warrant pertinent information which would otherwise have undermined the existence of probable cause.

In particular, Eiras first contends that in the affidavit supporting the arrest warrant, Baker failed to establish probable cause for each element associated with the different

charges against Eiras.  Response at 4.  Second, Eiras asserts that Baker's decision not to reference the November 26, 2007, and June 4, 2012 letters in the supporting affidavit for Eiras' arrest warrant represented a "purposeful omission of exculpatory evidence."  Id. Third, Eiras argues that Baker lacked probable cause to arrest Eiras under a Florida statute that regulated vendors of alcohol, but not distributors, where Eiras was licensed as the latter, but not the former.  Id. at 6.  Fourth, Eiras contends that because LGF did in fact possess a license to store alcohol in the entire 16th Street warehouse, Baker lacked probable cause to seek his arrest for improper storage of alcohol in that space.  Id. at 6-7.  Fifth, Eiras asserts that Baker lacked sufficient knowledge regarding whether Eiras had submitted false reports related to liquor transactions that were subject to state taxation.  Id. at 7.  Finally, Eiras posits that Baker's reliance on the advice from ABT legal counsel regarding the November 26, 2007, and June 4, 2012 letters, as well as whether Eiras could be prosecuted under a statute regulating venders rather than distributors, is insufficient to establish that Baker possessed either actual or arguable probable cause to make the arrest.  Id. at 7-8.  Therefore, according to Eiras, Baker is not entitled to qualified immunity.

Irrespective of the arguable probable cause standard normally applied when evaluating a claim of qualified immunity, in reviewing the evidence and drawing all reasonable inferences in Eiras' favor, Haves, 52 F.3d at 921, the Court determines without any hesitation that the undisputed facts demonstrate that a prudent officer in Baker's position would have believed he had actual probable cause to arrest Eiras.  See Lee, 284 F.3d at 1195.  Indeed, no reasonable jury could conclude that the facts known to Baker did not support a belief that there was probable cause to believe Eiras had

violated the law.  Moreover, Eiras has presented no evidence to support an inference that Baker "close[d] his eyes to facts that would help clarify the circumstances" associated with Eiras' eventual arrest, or that Baker declined to pursue "reasonable avenues of investigation . . . when . . . it [was] unclear whether a crime" had taken place.  BeVier, 806 F. 2d at 128.

Upon receiving the initial report from Lancaster that Eiras and his company, LGF, were allegedly concealing alcohol from the Florida ABT, Baker initiated an investigation that spanned three months.  That investigation included interviewing several individuals, inspecting multiple properties, and reviewing numerous liquor reports Eiras submitted to the ABT.  From the outset, Baker gathered information that strongly suggested that Eiras had in his possession multiple barrels of alcohol, but nonetheless had taken any number of measures to prevent ABT staff and others from knowing about or tracking the existence of the alcohol.

The evidence gathered by Baker also reflected that on numerous occasions when ABT staff conducted audits at the 16th Street warehouse, Eiras would provide them with access to only one storage unit, while simultaneously directing his employees to create barricades and obstacles so that the auditors could not gain access to other units in which he stored additional barrels of alcohol.  More particularly, on June 1, 2012, when ABT staff conducted a scheduled audit at the 16th Street warehouse, Eiras verified to ABT staff that the only alcohol on the premises to be inventoried was the product ABT staff inventoried in unit twenty-three, while in fact, in units twenty-four and thirty-three he also stored alcohol potentially subject to ABT oversight.  Likewise, when Eiras moved the barrels from the 16th Street warehouse to the Laney & Dunn warehouse, his agent,

Bandy, did not inform the staff at the Laney & Dunn warehouse that the trailer contained multiple barrels of alcohol, or the real reason he was seeking to store the trailer at the Laney & Dunn site.  This information alone would have led a "prudent law enforcement officer in [Baker's] position" to believe that probable cause existed to arrest Eiras for moving or concealing alcoholic beverages with the intent to defraud the state of excise tax, along with the storage of alcoholic beverages off of a licensed premises.  See Lee, 284 F.3d at 1195.

Moreover, the evidence obtained by Baker in his investigation supported a conclusion that for several inventory reporting cycles, Eiras failed to fully report liquor purchases to the ABT, resulting in potentially unpaid excise taxes of over $200,000.  See Investigative Report at 19-20.  Although ABT later entered into a stipulation with Eiras that he did not owe back taxes, ABT did not make that stipulation until October 12, 2012, a month and a half after Baker arrested Eiras.  Therefore, while Eiras did not submit false records to avoid state excise taxes, at the time Baker investigated Eiras and submitted an affidavit for his arrest, the information available to Baker suggested that he had done so.  Similarly, while the record now establishes that Eiras held a license for the entire 16th Street warehouse, and not just for unit twenty-four, the undisputed facts also reflect that at the time Baker investigated Eiras, the only information available to Baker indicated Eiras' license did not extend to the entire building.  Notably, "what counts for qualified immunity purposes relating to probable cause to arrest is the information known to the defendant officers or officials at the time of their conduct, not the facts known to the plaintiff then or those known to a court later."  Jones, 174 F.3d at 1283 n.4.

Throughout his deposition, Baker also emphasized that any number of factors led him to conclude he had probable cause to arrest Eiras for moving or concealing alcoholic beverages with the intent to defraud the state of excise taxes, for submitting false records to avoid excise tax, and the storage of alcoholic beverages off of licensed premises. For example, Baker referenced the numerous instances in which Eiras or his staff barricaded access to different units at the 16th Street warehouse thereby limiting inspection by the ABT auditors. Baker Deposition, Vol. I at 25-26, 28, 31, 37, 40; Vol. II at 10, 14, 25. Additionally, based on Baker's inspection of Eiras' monthly reports in conjunction with auditor Jones, Baker testified that he reasonably suspected that the apparent faulty reports represented Eiras' effort to evade paying excise taxes on the alcohol. Id., Vol. I at 12; Vol. II at 3-4, 5.

Finally, when Baker became aware of Eiras' November 26, 2007, and June 4, 2012 letters, he did not "close his eyes to facts that would help clarify the circumstances" associated with the letters. BeVier, 806 F.2d at 129. Rather, upon learning about the letters, Baker pursued further "reasonable avenues of investigation." Id. However, Baker did not uncover facts that verified the information contained in the letters. Additionally, he sought and obtained assurances from legal counsel and his supervisor that he could proceed with his investigation and eventual arrest of Eiras.[18] As such, when Baker sought

---

[18] In this context, an officer's reliance on legal advice can support a finding that the officer had arguable probable cause. See e.g., Poulakis v. Rogers, 341 Fed. Appx. 523, 533 (11th Cir. 2009) ("It stands to reason that an officer who, prior to an arrest, presents the facts to an assistant state attorney in the course of his official duties, and receives the prosecutor's advice that there is probable cause to arrest, would have a stronger reason to believe that there was probable cause."); see also Stearns v. Clarkson, 615 F.3d 1278, 1284 (10th Cir. 2010) ("Under certain circumstances, we have recognized that an officer's receipt of a prosecutor's pre-arrest probable cause determination supports the officer's qualified immunity defense."); Cox v. Hainey, 391 F.3d 25, 36 (1st Cir. 2004) (officer should be granted qualified immunity where an objectively reasonable officer would have taken attorney's opinion into account in deciding whether to make an arrest); Frye v. Kansas City Missouri Police Dep't, 375 F.3d 785, 792 (8th Cir. 2004) (following an attorney's advice can show reasonableness of officer's action for purposes of a qualified immunity analysis);

a warrant and subsequently arrested Eiras, his actions were "objectively reasonable based on the totality of the circumstances." Lee, 284 F.3d at 1195. "[T]he facts and circumstances within [Baker's] knowledge, of which he [had] reasonably trustworthy information, would cause a prudent person to believe that [Eiras had] committed . . . an offense." Id. Therefore, the Court concludes that a reasonable officer in Baker's position would have believed that he had actual probable cause to arrest Eiras.[19]

The Court next addresses Eiras' contention that Baker violated Eiras' constitutional rights when he arrested him for the unlawful storage of alcoholic beverages off of licensed premises, where the relevant statute at issue applied only to vendors, and Eiras was not a vendor, but rather, a distributor. See FLA. STAT. § 562.03 ("[i]t is unlawful for any vendor to store or keep any alcoholic beverages except for the personal consumption of the vendor, the vendor's family and guest in any building or room other than the building or room shown in the diagram accompanying his or her license application or in another building or room approved by the division."). Preliminarily, the Court reiterates that "[if an] arresting officer had arguable probable cause to arrest for any offense, qualified immunity will apply." Brown, 608 F.3d at 735. Thus, given that the Court has determined Baker

---

Kijonka v. Seitzinger, 363 F.3d 645, 648 (7th Cir. 2004) (noting that consultation with a prosecutor "goes far to establish qualified immunity"); Crockett v. Cumberland Coll., 316 F.3d 571, 584 (6th Cir. 2003) (officer's reliance on advice of attorney supports officer's reasonable belief that probable cause existed for arrest).

[19] Even if the Court had concluded Baker lacked actual probable cause to arrest Eiras, Baker undoubtedly had arguable probable cause to do so. A "reasonable officer[] in the same circumstances and possessing the same knowledge as [Baker could believe] that probable cause existed to arrest Eiras for the charges rendered against him. See Lee, 284 F.3d at 1195. In this context, Eleventh Circuit precedent instructs that "[s]howing arguable probable cause does not . . . require proving every element of a crime." Brown, 608 F.3d at 735 (citing Scarbrough, 245 F.3d at 1302–03). Indeed, "to require an arresting officer to prove every element of a crime would negate the concept of probable cause and transform arresting officers into prosecutors." Gates v. Khokhar, 884 F.3d 1290, 1300 (11th Cir. 2018) (internal citations and quotations omitted). In this regard, the Court rejects Eiras' argument that because Baker did not establish probable cause for each element of the several charges rendered against Eiras, Baker therefore lacked actual or arguable probable cause to arrest him.

had not just arguable probable cause, but actual probable cause to arrest Eiras for the other charges brought against him, Baker would be entitled to qualified immunity for arresting Eiras for this last charge. Id. Moreover, before seeking an arrest warrant against Eiras for violating Florida statute section 562,03, the uncontested evidence before the Court establishes that Baker sought direction from ABT legal staff, as well as his direct supervisor, as to whether Eiras' actions fell within the ambit of Florida law. And, as Baker testified in his deposition, both ABT legal staff, as well as his supervisor, advised him the statute could apply to Eiras. Baker Deposition, Vol. I at 17, 21. Accordingly, the Court finds that it was objectively reasonable for Baker to seek out, and rely upon the direction provided to him by the ABT legal staff, in the course of his determination that probable cause existed to arrest Eiras for violation of Florida Statute section 562.03. See Poulakis, 341 Fed. Appx. at 533-34; see also Picray v. Duffitt, 652 Fed. Appx. 497, 499 (9th Cir. 2016); Stearns, 615 F.3d at 1284–85; Cox, 391 F.3d at 36; Frye, 375 F.3d at 792; Crockett, 316 F.3d at 584.

Turning to Eiras' assertions that Baker purposefully omitted information about the November 26, 2007, and June 4, 2012 letters from the affidavit supporting Eiras' arrest warrant, the Court determines that Baker's omission of this information was perhaps, and at most, negligent. However, nothing in this record supports the slightest inference that it represented an intentional reckless disregard for the accuracy of the affidavit, or that the inclusion of the information would have precluded a finding of probable cause. Daniels, 487 Fed. Appx. at 538; see also Smith, 506 Fed. Appx. at 898 (omissions made intentionally or with a reckless disregard for the accuracy of the affidavit violate the Fourth Amendment); Madiwale, 117 F.3d at 1327 ("Omissions that are not reckless, but are

instead negligent, or insignificant or immaterial, will not invalidate a warrant.").  In the course of investigating Eiras, Baker became aware of both the November 26, 2007, and June 4, 2012 letters that Eiras sent to the ABT.  In those letters, Eiras informed the department of the confusing circumstances associated with his possession of the multiple barrels of Happy Vodka, along with their various storage locations.  However, as Baker detailed in his Investigative Report, and testified in his deposition, he did not discount Eiras' letters out of hand.  Rather, he sought to substantiate the information contained in them.  As a result of his further investigation, Baker reported to his supervisors that he was unable to verify any additional documentation within his "Division in regards to the Federal litigation between Happy Vodka Corporation and NWB Imports & Exports. . . ." Investigative Report at 18.  Baker also

> consulted with Auditing Supervisor Margaret Perez in reference to . . . [Eiras] consulting with ABT in reference to the storage of any Happy Brand products to include the 55 gallon [barrels] . . .  Perez advised she had no knowledge of [Eiras] consulting ABT.  However, Perez did advise at one point . . . [Eiras] did have alcoholic beverages stored at a Federal bonded warehouse in Jacksonville . . . .  Perez stated once the alcoholic beverages are removed from the Federally bonded warehouse and released to the distributor all the alcoholic beverages need to be disclosed to the Division; failure to do so is a violation of Florida statute.

Id.  Finally, Baker sought advice from ABT legal counsel as to how to best proceed in light of the information contained in Eiras' November 26, 2007, and June 4, 2012 letters. Ehrhardt, counsel to ABT stated that

> [u]pon being advised of the fact[s] and evidence, I advised Special Agent Baker that in light of the June 4, 2012 correspondence, the investigation should continue.  Upon conclusion of the investigation, I determined that ABT possessed sufficient evidence to support a finding of probable cause to arrest Christopher J. Eiras.  My conclusion was based upon the totality of the evidence, my knowledge of governing statues and rules, and my experience as a criminal prosecutor and defense attorney.

Ehrhardt Affidavit at 136-37. Similarly, prior to presenting Judge Merritt the supporting affidavit for Eiras' arrest, Baker met with an assistant state attorney who reviewed and approved the arrest warrant. Investigative Report at 31.

These facts establish that while Baker omitted the information about the letters from the affidavit supporting the arrest warrant for Eiras, no reasonable jury could conclude that he did so with an intentional reckless disregard for the accuracy of the affidavit. Rather, Baker sought to verify the information contained in the letters, and sought legal advice and affirmation that he could proceed in his investigation and eventual arrest of Eiras. Moreover, even with his knowledge of and subsequent investigation of the letters, Baker identified any number of other facts that led him to believe that probable cause existed to arrest Eiras. See Lee, 284 F.3d at 1195. Therefore, the uncontested facts[20] before the Court establish that in omitting from the affidavit information about the November 26, 2007, and June 4, 2012 letters, Baker did not demonstrate an intentional reckless disregard for the accuracy of the affidavit, nor would a finding of probable cause have been prevented had Baker included the information about the letters. See Smith, 506 Fed. Appx. at 898; Daniels, 487 Fed. Appx. at 538; Madiwale, 117 F.3d at 1327.

In conclusion, having reviewed all the evidence and made all reasonable inferences in Eiras' favor, Haves, 52 F.3d at 921, the Court finds that Baker undoubtably had at least arguable probable cause to arrest Eiras. Indeed, on this record no reasonable jury could conclude that Baker had anything less than actual probable cause to arrest Eiras. See Lee, 284 F.3d at 1195. Moreover, the record fails to support even

---

[20] As noted earlier in the Order, Eiras does not specifically challenge any of the facts Baker details in his Motion. Nor does Eiras identify with particularity any disputed facts between the parties. Instead, Eiras asserts that based on the facts before the Court, no reasonable officer could conclude probable cause existed to warrant Baker's arrest of Eiras. Response at 3, 4, 5, 7, 8.

an inference that Baker demonstrated a reckless disregard for the accuracy of the information he provided in support of his request for Eiras' arrest warrant, when Baker omitted from the affidavit information related to Eiras' two letters to ABT, or that the information would have undermined a finding of probable cause. See Smith, 506 Fed. Appx. at 898; Daniels, 487 Fed. Appx. at 538; Madiwale, 117 F.3d at 1327. As such, judgment is due to be granted in favor of Baker on Count I.

In Count IV, Eiras asserts a malicious prosecution claim against Baker under Florida law. See Complaint at ¶¶ 41-44. Here, Baker erroneously relies on the doctrine of qualified immunity as grounds for summary judgment in his favor on this count. The Court has already noted that the qualified immunity defense cannot be applied to state law claims. See D'Aguanno, 50 F.3d at 879. However, within his misplaced qualified immunity argument, Baker argues that Eiras has failed to show that there is any genuine issue of fact with regard to whether Baker had probable cause to arrest him. Motion at 7. Thus, Baker argues he should be granted summary judgment on this claim. The record before the Court undoubtedly supports the entry of such judgment.

As previously noted, under Florida law,

a plaintiff must establish each of six elements to support a claim of malicious prosecution: (1) an original judicial proceeding against the present plaintiff was commenced or continued; (2) the present defendant was the legal cause of the original proceeding; (3) the termination of the original proceeding constituted a bona fide termination of that proceeding in favor of the present plaintiff; (4) there was an absence of probable cause for the original proceeding; (5) there was malice on the part of the present defendant; and (6) the plaintiff suffered damages as a result of the original proceeding.

Kingsland, 382 F.3d at 1234. "The failure of a plaintiff to establish any one of these six elements is fatal to a claim of malicious prosecution." Alamo Rent-A-Car, Inc., 632 So.

2d at 1355. As discussed earlier in the Order, the Court has determined that Baker had probable cause to arrest Eiras. Thus, Eiras cannot establish the "absence of probable cause," a necessary element of his state law malicious prosecution claim. As such, the Court determines that summary judgment is due to be entered in favor of Baker as to Count IV as well.

In previous rulings, the Court dismissed Counts II, III and V of Eiras' Complaint. <u>See</u> Order of Dismissal (dismissing Counts II and III); Second Order of Dismissal (dismissing Count V). With this Order, the Court grants summary judgment to Baker on Counts I and IV. Now having resolved all claims, the Clerk of the Court will be directed to enter judgment in favor of Defendants State of Florida Department of Business and Professional Regulation, Division of Alcoholic Beverages and Tobacco and Baker, and against Eiras, as to all claims in this action.

In light of the foregoing, it is hereby **ORDERED**:

1. Plaintiff Christopher J. Eiras' Request for Oral Argument (Doc. 58) is **DENIED**.

2. Defendant Eugene R. Baker, Jr.'s Motion for Final Summary Judgment and Supporting Memorandum of Law (Doc. 57) is **GRANTED**.

3. The Clerk of the Court is directed to enter judgment in favor of Defendant State of Florida Department of Business and Professional Regulation, Division of Alcoholic

Beverages and Tobacco on Counts III and V, and in favor of Defendant Eugene Baker as to Counts I, II and IV.

4.  The Clerk of the Court is directed to terminate any remaining pending motions as moot and close the file.

   **DONE AND ORDERED** in Jacksonville, Florida, this 4th day of February, 2019.

   **MARCIA MORALES HOWARD**
   United States District Judge

lc26
Copies to:
Counsel of Record